Ruth S. BROWN et al., Plaintiffs,

v.

AMERICAN ENKA CORPORATION, Defendant.

No. CIV-2-75-43.

United States District Court,
E. D. Tennessee,
Northeastern Division.

May 19, 1976.

On Motion for Review of Taxing of Costs Oct. 7, 1976.

Carleton W. Smith, Burkhard & Smith, Greeneville, Tenn., and Charles R. Terry, Morristown, Tenn., for plaintiffs.

Joe A. Tilson, Taylor, Tilson, Inman, Reams & Lawson, Morristown, Tenn., Stephen N. Shulman, and Patricia Magee Vaughan, Washington, D. C., for defendant.

## MEMORANDUM

NEESE, District Judge.

This is an action under the Equal Employment Opportunities Act for an alleged violation of the civil rights of the plaintiffs. The Court determined earlier that it has jurisdiction of the subject matter, 42 U.S.C. § 2000e–2,[1] 5[2]; 28 U.S.C. § 1343(4). Memo-

---

1. " * * * It shall be an unlawful employment practice for an employer—
   " * * * to discriminate against any individual with respect to his * * * conditions * * * or privileges of employment because of such individual's * * * sex * * * ". 42 U.S.C. § 2000e–2.

2. " * * * Each United States district court * * * shall have jurisdiction of actions

randum opinion and order herein of July 28, 1975. By consensus of the Court and counsel, trial of the issues was bifurcated, agreed order herein of March 11, 1976, and the remaining issue[3] of any liability of the defendant to the plaintiffs was tried by the Court on March 22–24, 1976. Counsel have now amended their proposed findings and conclusions.

## FINDINGS OF FACT

The plaintiffs are nine former hourly employees of the defendant. They contend that the defendant's personnel utilized discriminatory methods against them to eliminate them systematically from their former employment because of their sex, i. e., female.

The defendant operated a rayon filament plant in this district. *Inter alia*, textile yarn was manufactured in the spinning department of this plant. Such yarn was spun on rotating doffs by spinners into cakes.[4] When this operation was completed, the resulting cakes were wrapped in paper socks by employees, known as cakewrappers, who performed other comparatively minor duties associated with the wrapping process. All the cakes were then placed upon an iron carrier[5] suspended from an overhead monorail system which ran throughout such department by the cakewrappers and trucked (pushed) by the cakewrappers some 530 feet to a cake chest into which the wrapped cakes were dumped.

For about 13 years, while the monorail system was newer, the cakewrappers experienced little or no difficulty in trucking the doff-filled carriers.[6] As the system aged, the carriers gradually became harder to truck on the monorail.

During all or some part of the year 1967 and the early part of 1968, all the cakewrappers in the department mentioned were citizens of the United States, and all of them were females. Four cakewrappers were assigned to each of the four shifts during which the department was operated. Each cakewrapper was in probationary status for four months. Each plaintiff was a member of the United Textile Workers of America, AFL–CIO, local no. 815 (the union).

As the carriers became harder for the cakewrappers to truck, many complained to their union leader about this employment problem. Representatives of such union and management met on April 16, 1968.[7] In this meeting the union representatives requested that assistance be provided the cakewrappers by management in their trucking duties, and that the carriers be repaired extensively.

Two days afterward, viz., on April 18, the cakewrappers assigned to work on the "C" shift of the department, did not report for work. Another meeting ensued on the same date between labor and management representatives. Thereat the union representative contended that, even if the carriers were repaired, they would return to their previous poor condition in a matter of days. Thereat also, the defendant's plant manager assured the union representatives that management would provide men to assist the cakewrappers with their trucking duties until the requested repairs were completed. Management also assured the union leaders that no cakewrapper would be required to truck a carrier which failed to

---

brought under this subchapter [subchapter VI of chapter 12]. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed * * * ". 42 U.S.C. § 2000e–5(f)(3).

3. The plaintiffs abandoned pretrial their claims of additional unlawful practices with respect to compensation and in-service promotions.

4. Such cakes weighed about 60 pounds, each.

5. These carriers had one tray in the middle, flanked by similar trays on each side thereof, and each weighed, when loaded, about 500 pounds.

6. About 35 doffs were scheduled to be produced on each shift.

7. All subsequent dates mentioned herein were in the year 1968.

roll freely, and that, in such an event, the cakewrappers should notify their supervisor to the end that necessary maintenance could be accomplished. Nonetheless, none of the cakewrappers reported for work on any shift on the following day, viz., April 19.

The bargaining agreement of management and the aforenamed union provided, *inter alia*, for settlement of all grievances arising thereunder by a grievance procedure; that, during the term thereof, the union members would not strike in any of several stated forms; and that management could discipline any striking violater of the agreement by discharge or otherwise. Management called upon the plaintiffs' union on the latter date to prevent or end such strike; and on the same day notified all employees in the aforementioned department of the unauthorized strike by the cakewrappers, and that they would be discharged if they failed to return to work on their respective regular shifts by April 21, next.

The cakewrappers commenced a return to work on April 20, and two days afterward the union filed a grievance, contending that the conditions of the carriers and their accessories, monorails, switches, and cake chest doors had caused numerous injuries; that the trucking was too hard for females to do; and that males should be assigned to do the trucking until the condition of the carriers was corrected and measures could be taken to relieve the cakewrappers of all trucking duties. Two days after such filing, management answered that considerable corrective work had been done on such equipment and would be continued until all such was in proper mechanical condition; and agreed to provide males to push the loaded carriers to the cake chests until problems involving such pushing and other safety hazards were eliminated.

The defendant's personnel made a determination on May 2 that such corrective repairs had been completed, and that the cakewrappers should resume their former trucking duties; however, management reduced simultaneously by about one-half the distance the cakewrappers would truck the carriers and directed that they not truck any carrier which would not push easily. The cakewrappers resumed trucking on two of the shifts which worked May 3, but similar workers refused to do the trucking on one of the same shifts and another shift on May 4. The cakewrappers continued to insist that no repairs had been made to the equipment (or had been made inadequately), and that they could not physically push some of the carriers. A plea by their union vice president failed to persuade the cakewrappers on the shift (which had trucked on May 3 and had not trucked on May 4) to resume trucking. Management representatives continued to advise the cakewrappers several times that none of them should undertake to truck a carrier which was overly difficult to negotiate, but instead, should report such difficulty to her foreman.

The defendant's plant superintendent conferred with each cakewrapper on one shift on May 4 and advised them of the necessity that they perform their trucking functions when a carrier was not too difficult to truck. The plaintiffs Ms. Bonnie Smith, Ms. Betty C. Ferrell and Ms. Vivian Dockery, each, responded that she would push without help only the carriers she found she could push, and was discharged by such superintendent. The plaintiff Ms. Mable Major, who had been excused from trucking on that date because of illness, returned to the department from the nursing station of the plant, learned what had transpired, and also resigned. When the plaintiffs Ms. Fern H. Starnes, Ms. Ruth S. Brown, Ms. Dorcas L. Ivy, and Ms. Willie Nell Newman learned on May 5 of the action taken by their aforenamed coplaintiffs, each of them was discharged by such superintendent. The plaintiff Ms. Janie Sartain was discharged on May 23 because of her unsatisfactory performance of her duties during her probationary period. The defendant hired male cakewrappers to replace the plaintiffs.

### CONCLUSIONS OF LAW

This Court has jurisdiction of the parties and of the subject matter, *supra.*

The defendant is an employer under the Equal Employment Opportunities Act. 42 U.S.C. § 2000e(b). Each plaintiff had the burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, 677[8] (a racial discrimination action under the Equal Employment Opportunities Act). If a prima facie case was established, the burden " * * * to articulate some legitimate, non-discriminatory reason * * * " for the action of its personnel shifted to the defendant. *Ibid.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. Upon rebuttal evidence's being offered, the ultimate burden of persuasion by a preponderance of the evidence that discrimination had taken place rested upon the shoulders of each plaintiff. *Cf. Bittar v. Air Canada*, C.A. 5th (1975), 512 F.2d 582, 582–583 (an age discrimination action under 29 U.S.C. §§ 621, et seq.)

■ Reason and common-sense permit the Court, as the finder of the facts, to draw particular inferences as to the existence of a fact, not actually known, from its usual connection with other facts which have been established by the evidence. *Illinois C. R. Co. v. Interstate Commerce Com.* (1907), 206 U.S. 441, 461, 27 S.Ct. 700, 51 L.Ed. 1128, 1136.

■ Where there is evidence that an employer's work allocation has a significant adverse impact on the employment opportunities of employees, because of their sex, and where there is a reasonable alternative to that work allocation which would reduce this impact, then the employer must adopt that alternative or show a substantial justification for not so doing. EEOC decision no. 71–1332, Employment Practice Guide (CCH) 6212. Equal Employment Opportunity Commission (EEOC) decisions are that agency's interpretation of the act and indicate what are and what are not proscribed discriminatory practices; they are entitled to great deference with respect to the proper interpretation of actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. *Hutchinson v. Lake Oswego School District No. 7*, C.A. 9th (1975), 519 F.2d 961, 965[4].

■ Where the Court evaluates the evidence presented by alleged discriminatees, including any statistical evidence on the issue of a policy of a proscribed discrimination, the ultimate issue remains, whether the alleged discriminatees have shown by a preponderance of the evidence that there was a violation of the Civil Rights Act of 1964. *Heard v. Mueller Company*, C.A. 6th (1972), 464 F.2d 190, 193. Even so, statistical evidence of a pattern or practice of discrimination (or the lack thereof) is not determinative of an employer's reason for action taken against individual grievants. *Terrell v. Feldstein Company, Inc.*, C.A. 5th (1972), 468 F.2d 910, 911[1].

## COMMENTARY [8]

The Court has found established by the evidence the fact that the defendant's personnel replaced its female cakewrappers with male cakewrappers. Reason and common-sense might permit the Court to draw the particular inference from such established fact the further fact, not actually known, that such replacement of the defendant's personnel was accomplished by them designedly to eliminate its female cakewrappers from its employ and to replace them with male cakewrappers in a discriminatory manner and, thus, in furtherance of the unlawful employment practice of discriminating against such female cakewrappers with respect to the conditions and privileges of their former employment because of the sex of such female cakewrappers. The evidence does not permit such an inference.

The statistical evidence reflects no purpose by the defendant to discriminate against women in its employment because of the sex of the women. In the year 1969, the defendant was hiring a greater percentage of female employees that it had hired

---

8. To the extent that further factual findings are included in this discussion, the facts thus found are additional findings of fact. Rule 52(a), Federal Rules of Civil Procedure.

in 1968.[9] It had terminated involuntarily only 23.5% of its female hourly employees in 1968 as compared to 72.7% of its male hourly employees. In the year ended at approximately the time in 1968 that labor and management experienced its difficulty herein over the trucking of the carriers, its rate of employment of female operators increased by better than 10%, while its employment of male operators decreased. 46 of the defendant's employees were discharged for participating in a wildcat strike in 1969; all 46 of them were male. Accordingly, from a statistical standpoint, it would not be reasonable to infer that the defendant was "anti-female" in its employment policies. This may, or may not, be indicative of the defendant's reason for the action of its personnel in relation to these plaintiffs.

The reasonable inferences from the evidence established by the facts herein appear to be that the defendant's equipment, with the passage of time did fail to function as smoothly as it did formerly; that the female cakewrappers did experience difficulty in undertaking to truck the carrier; that the defendant did undertake a corrective repair of its equipment;[10] and that these corrections did not render the equipment completely smooth in further operations for a time. At the same time, the direct evidence reflected that, after the confrontation of the defendant and the representative of the plaintiffs' union in mid-April, 1968, management did not require its female cakewrappers to truck these carriers when they proved hard to negotiate.

The gist of the terminations of the plaintiffs may be inferred reasonably to have been predicated on their notion that trucking the carriers should not be required of female cakewrappers as a part of the duties of their job and that, despite the concessions and reassurances of management that none of them were required to perform this duty when it was too difficult for them to perform, they concluded that they would be required to continue to truck in any event and were voluntarily terminated their respective employments for that reason.

■ With the state of the proof in this posture, this Court cannot, and does not, draw the inference that the elimination of the female plaintiffs as cakewrappers from the employ of the defendant and their replacement by male cakewrappers constituted a discrimination against the plaintiffs with respect to the conditions and privileges of their respective former employments because of the sex of the plaintiffs. It appears further to the Court that the defendant's personnel adopted and sought with becoming diligence to implement the only reasonable alternatives to the allocation of its cakewrapping which was having an adverse impact, because of their sex, on the employment opportunities of the plaintiffs.

This being true, it is the decision of this Court that the plaintiffs take nothing from the defendant, and that the plaintiffs hereby are DENIED all relief herein. Rule 58(1), Federal Rules of Civil Procedure.

## ON MOTION FOR REVIEW OF TAXING OF COSTS

Costs were taxed herein to the defendant as the prevailing party by the clerk after proper notice. Rule 54(d), Federal Rules of Civil Procedure. On timely motion, the plaintiffs asked for a review of the clerk's action, *idem.*, claiming, *inter alia*, that such

---

9. 28.8% in 1969 as compared to 27.3% the previous year.

10. The defendant maintained its carriers with six millwrights. In April, 1968 these craftsmen checked in a period of 2½ weeks the wheels thereof, replaced all worn or damaged parts, checked and replaced (where indicated) the bearings, yokes and axles of their "U"-shaped mountings, checked the lids and latches. They also checked the switches and bolts of the overhead monorail and realigned 10 of the 105 carriers, having made repairs of some type of 40 of the 200 carriers in the system. Another week was devoted to a similar task in the middle of June, 1968. Even so, these craftsmen concede that a wheel undergoing wear is hard to push and, even where a wheel is replaced, it continues to be difficult to truck until it is broken-in.

was premature, ostensibly because the appellate process is not complete.

Under local Rules of, this Court, App., § 3, costs are to be taxed according to the provisions of 28 U.S.C. §§ 1911–1929, inclusive. Thereunder, esp. 28 U.S.C. § 1920, it was proper for the bill of costs to be filed herein, but it is not to be included in a judgment except "upon allowance," *idem.* In the light of the application of the plaintiffs for a review of such taxation, such costs have not yet been allowed.

Such costs should not be allowed until the appellate process is complete, and this action has been remanded to this Court for entry of a final judgment. *Mishawaka Rubber Woolen Mfg. Co. v. S. S. Kresge Co.,* C.C.A. 6th (1941), 119 F.2d 316, 326[41, 42], reversed on other grounds (1942), 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381. This is because, should the costs be allowed to the defendant now, if the Court of Appeals reversed the judgment of this Court on appeal, it would appear the plaintiffs might be barred illogically and contrary to the statute, from taxing the costs against the defendant. *Cf. Fleischer v. A. A. P., Inc.,* D.C.N.Y. (1964), 36 F.R.D. 31, 33–34[1], cited in *American Infra-Red Radiant Co. v. Lambert Industries, Inc.,* D.C.Minn. (1966), 41 F.R.D. 161, 163[4].

In the exercise of the discretion committed to it in such matters, the Court hereby DIRECTS that the matter of allowance of costs herein be delayed until the pending appellate process * is completed.

---

\* It is intended by this Court that such process include any certiorari action involved.